2 B    406
216    340
1810.

Philadelphia,
Saturday,
March 31.

HAVARD *against* DAVIS.

IN ERROR.

A will in writing of lands may be revoked by the parol republication of a former will in writing. And in order to ascertain whether the republished will operates as a revocation, the contents may be proved by parol, if the will itself cannot be found, and the usual ground is laid for introducing the secondary evidence.

ERROR to the Common Pleas of *Chester* county.

This was an issue directed by the Register's Court, to try whether a certain paper writing, dated the 19th of *September* 1806, was the last will and testament of *Samuel Havard*, or not. The defendant in error, who was plaintiff below, was a principal devisee in this will.

Upon the trial of the issue, the will in question, which contained in it a clause revoking all former wills, was proved by the oath of *John Davis* one of the subscribing witnesses; the signature of *Benjamin Torbert* the other witness, who died before the trial, was proved by three witnesses; and two witnesses swore that they believed the body of the will to be in the testator's handwriting. It was also proved, that on the *Thursday* preceding his death, the testator again acknowledged this paper as his last will, in the presence of *John Davis*, *William Davis* the executor named in it, and *John Havard Davis* his son the plaintiff, and delivered it into the possession of the executor, with a request that in case he died, no time should be lost in getting it proved, as there would be many disappointments.

The testator died on *Saturday* the 19th of *November* 1808, about eighty years old.

On the part of the defendant below, *Sarah Havard*, the sister of the testator, deposed, that about two weeks before his death, *B. Havard* the defendant came to his house, and that the testator spoke to him the following words: " *Benjamin*, I have made several wills. They are in my desk. " But the last will that I made, *Ezekiel Potts*, *Billy Potts*, " and *Tommy Jones* are witnesses to. Get that one proved," or " let that one be proved." " If thee wants any assistance " in settling my affairs, get *John Jacobs*; don't let *Bill Davis* " go among my papers, or he'll slip them bonds out that I " have against him." She also deposed, that the day before the testator's death, he forbad her sending the plaintiff to his desk, lest he should slip out the 400*l*. bond he had against

his father; and that in the summer preceding he had declared that the plaintiff should have no " holding" on the lands, and that the place should be the defendant's; that it should not go out of the *name*.

*John Jacobs* deposed, that in the middle of *August* 1808, he was at the testator's house, and was requested by him to look over his papers. The testator told him that there was a bond which he could not see, and which he expected was amongst them; that he had been looking for it a few days before. The witness picked up a paper lying folded upon two others, opened it, cast his eyes to the bottom, and asked the testator whether he always kept a will by him. The testator asked who were the witnesses to that will, and then went on, " are they *Ezekiel Potts*, *Billy Potts*, and *Tommy* " *Jones?*" " Yes," said the witness, " they are." The testator then took the paper out of the witness's hands, looked at it and said " *This is my last will.*" That will was dated in 1806. On *Sunday* morning before the testator's death, he requested the witness to go up stairs to his desk, and in a certain drawer he would find a bond against *Billy Davis*. The witness went up, and saw the same will lying, in the same form, upon two other papers. He took it up, and read it. The two *Potts's* and *Jones* were the witnesses. On *Wednesday* the testator asked him whether he had seen his will, the day when he sent him up for *William Davis's* bond. He replied that he had seen two or three wills. " Did thee see the " one witnessed by *Ezekiel Potts*, *Billy Potts*, and *Tommy* " *Jones*, made about two years ago?" The witness told him he had. " *That is my last will*" he said, and requested the witness to help the defendant settle his affairs. The witness knew that after this, the testator was not able to get out of his bed; and he saw the testator's papers *generally* in the possession of *William Davis*, the executor in the will of *September*, the day but one after the testator's funeral.

*Ezekiel Potts*, *William Potts*, and *Thomas Jones*, deposed, that in *August* 1806 they subscribed their names as witnesses to a paper, which *Samuel Havard* signed in their presence, and declared to be his last will and testament.

The defendant having proved a notice to the plaintiff, to his counsel, and to *William Davis*, to produce the will of *August*, then offered the said *John Jacobs* as a witness to

prove the contents of that will. But this evidence was objected to, and overruled by the court.

He then offered the same witness " to prove the declaration " tions of *Samuel Havard*, (the testator) made shortly before " and shortly after the date of the said paper writing read to " the jury, (the will of *September*,) and the paper writing said " to be executed in *August* 1806, for the purpose of shewing " the intention of the said *Samuel Havard* to dispose of his " estate differently from what is done by the said paper " writing read to the jury, and for the purpose of shewing " that he had made no such writing as that read to the jury." This was also objected to, and overruled by the court, who sealed a bill of exceptions upon both points. The jury found for the plaintiff.

The exceptions were argued at *December* term 1809 by *T. Ross* and *Ingersoll* for the plaintiff in error, and by *Hemphill* and *Tilghman* for the defendant in error.

For the plaintiff in error. 1. The contents of the will of *August* should have been received in evidence upon two grounds. First, because there was sufficient proof of its being in existence at the testator's death, and of its having come to the hands of *William Davis*. Secondly, to shew a revocation of the will of *September*, by proving that the will of *August*, which had been republished, was contrary to it.

*First.* If a will continue in writing at the time of the testator's death, though it be lost or burnt afterwards, it stands good. *Lawrence* v. *Kete* (a). But to know to what purpose it is good, the contents must be proved. It may be good to establish a presumption of fraud, in obtaining a contrary will a month afterwards. If the will had been in our possession, no doubt we might have produced it; and the rule of evidence is universal, that where the writing itself would be evidence, its contents may be proved, if the original is lost, or is in the hands of the opposite party, and notice has been given to produce it. *Peake Ev.* 97. *Gilb. Ev.* 96. *Cole* v. *Gibson* (b), *Medlicot* v. *Joyner* (c), *Read* v. *Brookman* (d), *The King* v. *Cul-*

(a) *Aleyn.* 54.    (b) 1 *Ves.* 505.    (c) 1 *Mod.* 4.    (d) 3 *D. & E.* 151.

*pepper* (*a*). 12 *Vin*. 233. *pl*. 13. In this case especially the evidence should have been received, because there was strong presumption that the executor of the other will, the father of the principal devisee, had gotten possession of the will of *August*, and if it had not made against him, would have produced it. 1 *Ld. Ray*. 731. Where the heir at law suppresses a will, chancery will decree the devisee to hold, until the will is produced. *Hampden* v. *Hampden* (*b*). But what the devise, or who the devisee is, cannot be known without proof of the contents.

*Secondly*. The republication of a former will revokes a contrary will of later date; and to shew the contrariety, the contents of the republished will, if lost, may be proved. Here was a valid republication of the will of *August*, the testator having declared it to be his last will in the presence of *John Jacobs*, and *Sarah Havard*, long after the will of *September*. By the law of *Pennsylvania*, a declaration by the testator to two witnesses that the paper writing is his will, is sufficient, though they do not subscribe their names as witnesses; *the same* act therefore will amount to a republication. Republications are greatly favoured. If a man devises certain lands, and then aliens, and repurchases, and afterwards shews his intention that the said will shall be his last will, this is a new publication, and the lands shall pass. 7 *Bac. Abr*. 320. Parol declarations have been held to republish a will of lands in *England* even since the statute of frauds. *Hall* v. *Dunch* (*c*). If the testator says his will is in a box in his study, this is a new publication. *Cotton* v. *Cotton* cited in *Alford* v. *Earle* (*d*). Can such a republication then, revoke a will in writing in this state? We contend it may. The 6th section of the act of 1705, 1 *St. Laws* 55, directs that " no " will in writing, concerning any goods or chattels or per- " sonal estate, shall be repealed, nor shall any clause, " devise or bequest therein, be altered or changed by " *any words, or will by word of mouth only*, except the same " be in the lifetime of the testator committed to writing, and " after the writing thereof read unto the testator, and allow- " ed by him, and proved to be so done by two or more wit-

(*a*) *Skinn*. 673.　　　　(*c*) 1 *Vern*. 330.
(*b*) 1 *P. Wms*. 733.　　　(*d*) 2 *Vern*. 209.

1810.

HAVARD
v.
DAVIS.

"  nesses." Admitting that this extends to lands, an original will in writing, without the signature of witnesses, without any thing but the parol declaration of the testator that it is his last will, would clearly revoke a different prior will. If a former will is republished with the same solemnities that would make an original will, it does not differ in any respect from an original will; it therefore in like manner amounts to a revocation. The statute of frauds as to revocations has a different effect. By the 6th section, no devise can be revoked but in one of three ways: by burning, cancelling &c., by a writing of revocation, or by some other will. If it is by some other will, this, according to *Ecclestone* v. *Pelly* (a) must be a good will under the statute, that is, it must be attested and *subscribed* in the testator's presence by three or four witnesses; and therefore a republication to produce a revocation, must be executed in the same way. *Pow. on Dev.* 630. But the same rule of construction applied to our law, gives a different result; that is, a republication of a will in writing by parol may revoke a will, because a will in writing published by parol may do it. Unless however the contents of the republished will are known, it cannot be said that they are a revocation. To produce this effect it must be a different will; and it is a question for the jury to say, upon the evidence of the contents, whether different or not. The case of *Goodright* v. *Harwood* (b) shews plainly that the contents should have gone to the jury with this view, for if there is no difference, there is no revocation.

2. The declarations were admissible in three points of view, to shew fraud, to prove a republication, and to give the testator's meaning at the time of executing his will. There was a strong suspicion of fraud on the testator's mind, as to the executor in the will of *September*. The 400*l.* bond, and the disappearance of the will of *August*, which the testator could not have destroyed, and which probably went with the other papers, were a sufficient ground for the evidence. To shew that a later will was obtained by fraud, parol evidence may be given, that the testator at the time of signing it, asked if it was the same as a former will, and was answered in the affirmative. *Small* v. *Allen.* (c) That they might have

(a) *Carth* 79.        (b) 3 *Wils.* 497.        (c) 8 *D. & E.* 147.

proved a republication, is clear from the arguments already urged. They should however at all events have been admitted upon the principle of *Hurst* v. *Kirkbride*, cited in *Wallace* v. *Baker*. (*a*) They were declarations shortly after and shortly before, which includes the time up to the very moment of execution. The declarations of a testator after an unsuccessful attempt to tear and burn his will, may be proved to shew that he meant to destroy it; *Bibb* v. *Thomas* (*b*), *Pow. on Dev.* 635; and similar declarations were admitted in *Boudinot* v. *Bradford* (*c*), and in *Lawson* v. *Morrison* (*a*).

1810.

HAVARD
*v.*
DAVIS.

For the defendant in error. The will of *September* was completely proved; it contained a clause revoking all former wills; and it subsisted at the death of the testator. The evidence offered, was in the first place to prove the contents of a will not shewn to be in existence at his death, and which had been expressly revoked; and in the next place by parol declarations to revoke a will in writing. It was properly rejected in both instances.

1. As to the contents. There was no evidence whatever that the will of *August* existed at the testator's death; at least it was thought insufficient by the court to ground the secondary evidence; and it is the court that is to judge in the first instance, whether due proof of such existence and loss has been given, to justify the admission of inferior evidence. 3 *Bl. Comm.* 368. What the jury might have inferred from the evidence, is therefore of no importance in this point of view, because the evidence was not for the jury. The court must have adopted the presumption in *Lawson* v. *Morrison*, that the testator himself had destroyed the will, and that it was not in existence at his death. Now there is no instance where there has been a later subsisting will, and at the same time evidence has been admitted of the contents of a former will, not proved to have been in existence after the testator's death. It is otherwise with deeds and writings which have effect in the life of the party; but until the testator's death a will is nothing, and if it does not exist at that time, of course it is not evidence. The case of *Lawrence* v. *Kete* is in our

(*a*) 1 *Binn.* 616.        (*c*) 2 *Dall.* 267.
(*b*) 2 *W. Black.* 1043.    (*d*) 2 *Dall.* 289.

favour; proof of the contents is there confined to wills subsisting after the testator's death. But the evidence is said to have been admissible, because there was proof of a republication, and it went to shew a revocation of the will of *September.* This however cannot be, for it would constitute a revocation by parol. Undoubtedly, implied revocations may be proved by parol; for they are a consequence of law arising from some fact, and not from a declaration. But that is not the present case. The revocation is not pretended to arise from any fact, but from the declarations of the testator, of which there is no written evidence whatever. The act of assembly is express that there shall be no revocation by word of mouth only; from which it necessarily results that a republication by word of mouth only, cannot amount to a revocation. The case of *Hall* v. *Dunch* was decided upon a will before the statute; and it has been overruled, it having been since held, that the devising clause in the statute puts an end to all parol republications, as the revoking clause does to all parol revocations. *Pow. on Dev.* 665. *Bunker* v. *Cooke* (a), *Cave* v. *Holford*, in a note to *Williams* v. *Owen* (b), *Barnes* v. *Crowe* (c). Since that statute, a republication must be in writing; *Acherley* v. *Vernon* (d), *Bunter* v. *Coke* (e), *Hawe* v. *Burton* (f). If a republication by parol be good under the act of assembly, then after purchased lands will pass, and there will thus be a will of lands by parol. It is impossible to permit a parol republication to revoke a written will, without eluding the act of assembly altogether. It stands upon the same ground as the statute. The republication must have all the solemnities of an original will, or it will not answer. But it is essential to an original will that there be writing. It is true the signing of witnesses is not requisite; but writing of some kind to be witnessed, is. The republication therefore should be evidenced by writing. It is a fallacy to say that the will is the writing; because the execution of the will is not the matter in controversy; it is the republication that is to be proved, and of that there is no written evidence. It is not the will of *August* that revokes the will of *September;* it is the republication of that will, which is by word of mouth only.

(a) *Fitzgib.* 229.      (c) 1 *Ves. jr.* 495.      (e) 1 *Salk.* 238.
(b) 2 *Ves. jr.* 606.      (d) 9 *Mod.* 78.      (f) 8 *Vin.* 164. *pl.* 16.

2. As to the declarations. If they went to prove a revocation of the will of *September* in any way whatever, they were inadmissible, because they were parol. They might be admitted upon a question of sanity, but no such question was raised in this case. The declarations of a testator before and after making a will, are the most dangerous of all kinds of evidence. To preserve the peace of families, dispositions by will are frequently misrepresented; and the protection of testators in their old age many times depends upon it. To make them even competent evidence, the least that can be demanded, is that they should have been made *at the time* of executing the will, and should go to prove fraud, after a proper ground was laid for admitting them for that purpose. So was *Small* v. *Allen*. But the declarations of the testator even on his death bed, are not competent to shew that he had before executed his will under duress. *Jackson* v. *Kniffen* (a). It would not only set up parol evidence to destroy a written will, but would open a door to the grossest perjury. It is moreover not enough to cry fraud; it should be distinctly alleged, and there should be at least a colour for the charge. The bill of exceptions says nothing about fraud. The evidence was not proposed to shew it. It is an afterthought; for there was not a tittle of evidence that the will of *August* had come to the hands of *Davis*, or that any deception had been practised upon the testator. Considering the testator as a witness, the general rule of law is against admitting his declarations, and they fall within none of the exceptions. *Peake Ev.* 7. *Brown* v. *Selwyn* (b), *Ulrich* v. *Litchfield* (c), *M'Nally* 174, *The King* v. *The Inhabitants of Eriswall* (d). Considering them as explaining his own act, they can never be admitted except when made at the time, and then only to support an allegation of fraud.

*Cur. adv. vult.*

Tilghman C. J. The points which arise in this cause are stated in the bill of exceptions. It was an issue from the Register's Court, to try the validity of a writing exhibited as the last will and testament of *Samuel Havard* deceased,

1810.

Havard<br>v.<br>Davis.

(a) 2 *Johns*. 31.
(b) *Cas. Temp. Talb*. 240.

(c) 2 *Atk*. 373.
(d) 7 *D. & E.* 719.

1810.

HAVARD
*v.*
DAVIS.

dated 19th *September* 1806. The plaintiff below, *John H. Davis*, in support of the will, examined the subscribing witnesses and others. The defendant then examined witnesses, who proved that the testator made another will dated —— *August* 1806; that this will was in existence a few days before the death of the testator; and that subsequent to the making of the will of *September*, the testator had declared to several persons, that the will of *August* was his last will, and the one which he wished to be proved after his death. The defendant then offered *John Jacobs* as a witness, to prove the contents of the will of *August;* but his testimony was rejected by the court, and the defendant's counsel excepted to their opinion.

The object of the defendant, was to shew that the will of *August* was contrary to the will of *September* 1806, and to destroy the validity of the latter, by proving a parol republication of the former. The question is whether a will in writing can be thus revoked?

By the act of 1705, sect. 1, lands may be devised by " a " will in writing, proved by two or more credible wit- " nesses." But it is not necessary that the witnesses should subscribe their names; nor is it even necessary in all cases, that they should see the execution of the will. If it is in the handwriting of the testator, it may be proved by any two persons who know the handwriting. By the 6th section of the same act, " no will in writing shall be repealed, nor shall " any clause, devise, or bequest therein, be altered or chang- " ed by any words, or will by word of mouth only, except " the same be in the lifetime of the testator committed to " writing, and after the writing thereof read to the testator, " and allowed by him, and proved to be so done by two or " more witnesses;" that is to say, a will in writing shall not be revoked, but by a will in writing, or by *words* of the testator, reduced to writing before his death, and read to him. But there is no intimation, that it is necessary for the witnesses to subscribe their names, or that any greater ceremony or solemnity, should be necessary to prove a will which revokes a former will in writing, than would be required to prove an original will. A will in writing, republished after its execution, has all the effect of an original will from the time of republication. It will pass lands, purchased by the testator

between the first execution and the republication. Why then shall it not amount to a revocation of a second will, made subsequent to the execution of the first, but before its republication? Cases were cited on the argument, by the counsel for the defendant in error, to shew that in *England* since the statute of frauds, a will in writing could not be revoked by a parol republication of a former will. But a little attention to the statute of frauds will shew, that these cases are not applicable to the present question. It is enacted by that statute, " that no devise in writing of lands, shall be revocable otherwise than by some other will or codicil in writing, or other " writing declaring the same, or by burning, cancelling &c.; " but all devises of land shall remain in force, until the same " be burnt, cancelled &c., or unless the same be altered by " some other will or codicil in *writing*, or *other writing* of the " devisor, signed in the presence of three or four witnesses declaring the same." The statute is expressed in very clear terms, and the construction has been, that a will may be revoked in two ways; 1st, by a subsequent will executed with all the forms necessary to an original will devising land, viz. it must be signed by the testator, and attested by three witnesses, whose names are to be subscribed in the presence of the testator; or 2dly, a revocation may be by a simple writing of revocation, by which no lands are devised, signed by the testator in the presence of three or more witnesses, who in that case need not subscribe their names *in his presence*. To have any bearing on the present case, it should be shewn, that, before the statute of frauds, a revocation of a will in writing could not have been made by a parol republication of a former will. No such authority has been produced. On the contrary, it was said by Lord Chief Baron *Eyre* in *Barnes* v. *Crowe*, 1 *Ves. jun.* 497, that " before the statute, it was " no part of the essence of the obligation, that the will should " be re-executed. Any thing that expressed the testator's " intention, that the will should be considered as of a sub- " sequent date, was sufficient." Now if a parol republication had the effect of making the republished will operate from the date of the republication, it must necessarily have amounted to a revocation of any former will making a different devise of the same land. If the devises were the same, there would be no revocation, but rather a confirmation. But this shews the necessity of proving the contents of the republished will.

Unless the contents are known, it cannot be said to whom the land will pass. It has been argued however, that in the case before the court, no parol proof should have been admitted of the contents of the will of *August* 1806, because it was not expressly proved that the will was in existence at the death of the testator; and that the court, and not the jury, had the right of judging whether sufficient proof had been given of such existence. In answer to this argument, it is to be remarked, that the court, before the testimony of *Jacobs* was offered, had permitted evidence to be given to the jury, of the existence of the will of *August* a few days before the testator's death, and other evidence tending to shew that he never cancelled it; and notice had been given to the executor of the will of *September* 1806, and to those persons who had the possession of the papers of the testator in general, to produce the will of *August*. Under these circumstances it should have been left to the jury to decide, whether the will of *August* was republished, and in existence at the death of the testator; or if not in existence, whether it had not been improperly destroyed, without his knowledge; for in the latter case it would have been sufficient, though not in existence, to destroy the validity of the will of *September*. On this point, the case of *Rolfe's Lessee* v. *Harwood*, 3 *Wils*. 479, is very strong. The testator made a will devising land in 1748. He made another will in 1756, duly executed. The jury found, that the disposition of the land by the will of 1756, was *different* from that of the will of 1748, but in *what* was *unknown* to them. They did not find that the testator cancelled the will of 1756, or that it was destroyed by the person claiming under the will of 1748, but what was become of the same they knew not. On this finding, the heir at law of the testator had judgment to recover the land. The devise by the will of 1748 was revoked by a contrary devise in the will of 1756; but inasmuch as it did not appear what the devise of 1756 was, nothing passed by it, and the land descended to the heir. It is true, this judgment was reversed by the Court of King's Bench, and the judgment of reversal affirmed in the House of Lords, as appears in 2 *Black. Rep*. 937. But whoever reads the argument of Sir *Wm. Blackstone*, (in 3 *Wilson*) who dissented from the opinion of the Court of Common Pleas, will be satisfied that

the judgment was reversed, because the jury did not find in what the contents of the second will differed from the first; on the contrary they did not know the contents, and therefore it could not appear to the court that the two wills were different. But Sir *Wm. Blackstone* does not seem to have entertained any idea of its being improper to offer parol proof to the jury, of the contents of the will. On principles then, which may be drawn from the argument of Sir *Wm. Blackstone*, the jury would have been justified in finding against the validity of the will of *Samuel Havard*, made in *September* 1806, although the will of *August* was not in existence at the time of his death, provided they were convinced that the will of *August* was different from it, and could say in what that difference consisted, and that the will of *August* was republished subsequent to the will of *September;* and provided they were also convinced, that the testator never revoked the will of *August* after such republication. But in order to know whether the two wills were different, the jury should have been permitted to know the contents of both; and under the circumstances of the case, the defendant below never having had possession of the will of *August*, and having called on those persons to produce it, in whose hands it was most likely to be, I think parol testimony should have been admitted. I give no intimation of my opinion as to the strength of the evidence of a republication, produced by the defendant. It is sufficient that there was evidence, of which the jury were to judge. But this I will say, that nothing but very clear and strong evidence should induce a jury to set up a will which had been once revoked, and of the republication of which there was no written evidence.

Upon the whole my opinion is, that the evidence of *John Jacobs* was improperly rejected; and therefore the judgment of the Common Pleas should be reversed. Upon the other exception, respecting the rejection of the evidence of the testator's declarations, made shortly before and after the date of the two wills, I give no opinion.

YEATES J. after stating the evidence and the exceptions, delivered his opinion as follows.

It is certain that our act of assembly of 1705, " concerning the probate of written and nuncupative wills," differs in

many particulars from the *British* statute of frauds and per-juries, 29 *Car.* 2. *c.* 3. In *England,* by section 5, the wills " must be attested and subscribed in the *presence* of the de-" visor by three or four credible witnesses, or else they shall " be utterly void and of no effect." There the attestation in the testator's presence, is as essential as his signature. *Doug.* 244. *Carth.* 79. 1 *P. Wms.* 239. But it is sufficient if the testator be in such a situation, that he might see the witnesses sign, though he does not actually see them. 2 *Salk.* 688. 3 *Salk.* 395.. And where it does not appear by the terms of the attestation, that the witnesses subscribed their names in the presence of the testator, it is submitted as a fact to the jury, to determine, upon all the circumstances of the case, whether this provision of the law has been complied with. *Bull.* 265. 2 *Stra.* 1109. In this state, by section 1st of our law, all wills in writing, whereby lands are devised, being proved by two or more credible witnesses, shall be good and available to grant lands as well as goods; and it has been determined that it is not necessary here, that there should be subscribing witnesses to a will. 1 *Dall.* 94. Our late brother Judge *Smith* drew his will with great minute-ness, but no witnesses attested it. I fully know, that with him it was a favourite idea, that it was inexpedient to call in witnesses to subscribe a will, when the handwriting of the testator was readily susceptible of proof.

It will therefore be evident that the *English* cases on this branch of the law, are in many instances inapplicable to our system. In *Lawson* v. *Morrison and others,* 2 *Dall.* 289, it is said by *M'Kean* Chief Justice, that wills of lands must be revoked by writing, accompanied with solemnities equal to those necessary for making the wills. In *Boudinot* and *Wallace* v. *Bradford,* at the sittings in the city in *January* 1797, this point came before all the judges of this court for their decision. The defendant's counsel contended there, that the revocation of a will might be by parol before the statute of frauds, as the statute of wills did not direct what should be a revocation; 3 *Mod.* 260. 3 *Burr.* 1251; that our act adopt-ed part of the *British* statute, but rejected other parts of it, and particularly the 6th section which contains *exclusive* words respecting the revocation of a will of lands; and that the 6th section of our act being confined expressly " to a

" will in writing, concerning any goods or chattels or personal " estate," it followed, that the revocation of a will of real estate, must be governed by the decisions anterior to the statute of frauds. But the court unanimously resolved, that it never could have been designed by the legislature, that greater solemnity should be observed in the repeal or alteration of a written will concerning personal estate, than when it respected lands which were permanent in their nature, and would pass from generation to generation. The first section of our act directs, that all wills of real estate, proved by two witnesses, shall be valid unless they appear to be *annulled*, *disproved*, or *revoked*. And in the following section it is provided, that if any of the wills shall, within seven years after the testator's death, " appear to be disproved or annulled " before any judge or officer having conusance thereof, or " shall happen to be revoked or altered by the testator, either " by a latter will or codicil in writing *duly proved as afore-* " *said*, then and in such case the party aggrieved may have " his remedy" &c. The law supposes, that by a will being burnt, *cancelled*, torn or obliterated by the testator himself, or in his presence by his directions and consent, it ceases to be a will *ex vi termini;* and prescribes that the revocation by a latter will or codicil in writing must be *duly proved as aforesaid;* that is, by two witnesses in the manner before pointed out.

It is agreed on both sides here, that the republication of a will must be accompanied by the same solemnities, as were necessary to the publication in the first instance. And such is the current of authorities. *Fitzgib.* 229. 1 *Ves. jr.* 497. 2 *Ves. jr.* 660. 3 *Salk.* 154. *Bull.* 254. 2 *Johns.* 31.

With these introductory observations, I proceed to consider the errors assigned on the record.

It is contended that the contents of the will of *August* 1806, ought to have been permitted to be proved to the jury. An objection hereto presents itself at once. A written paper intended as a will at first, but burnt or destroyed before the testator's death, ceases to be a will, and is void in itself. Evidence therefore cannot be received of the contents of a will, which did not exist at the death of the testator. *Aleyn.* 2. 55. It is true, that a will, though gnawed to pieces by rats in the life of the testator, if by joining the pieces together

its contents may be known, will be capable of proof. 1 *Eq. Abr.* 402. So if a will be snatched from the hands of the executor, by a friend of the heir at law, and torn in pieces, a decree in equity will establish the will, when the pieces are picked up and stitched together. 2 *Vern.* 441. But in both these instances, the wills were in existence, and legally took effect when the testator died. A will shall not be revoked even by a subsequent writing, unless that be also a good will in all circumstances. 3 *Mod.* 258. *Carth.* 79. 1 *Show.* 89. To affect a devise in a former will, it must be shewn in fact, that it was revoked by another will which subsisted at the death of the testator. *Cowp.* 92.

But supposing that this objection could be got over, it will not be said that the contents of the will of *August,* could be better evidence than the will itself if produced. Would then this will be relevant evidence on the feigned issue? It preceded the will of *September,* and was expressly revoked thereby. It could have no influence on a latter will, unless proved by two witnesses to have been duly republished after the execution of the will of *September.* An attempt has been made to prove this republication, and the testimony has been heard; but the jury have negatived it by their finding. The ground of fraud I shall consider hereafter.

I distinguish this case on the point now under consideration, from that of *Goodright* v. *Harwood,* reported in 3 *Wils.* 497. There a special verdict found, that the testator had duly made and published a will in 1748, under which the defendant claimed; and that he made and duly published another will in 1756; that the disposition made therein was *different* from the disposition in the will of 1748, but in what particulars was unknown. The jurors said that they did not find that the testator cancelled his will of 1756, or that the defendant destroyed the same; but what was become thereof, they said they were altogether ignorant. Three of the judges of the Court of Common Pleas held, that the *subsequent* will in writing, found by the jury to be different from the former, was a sufficient proof of the revocation of the will of 1748. This judgment was afterwards reversed in the King's Bench, and that reversal was affirmed in the house of lords. 2 *Bla. Rep.* 937. A deliberate act, plainly inconsistent with the disposition of property under an antecedent will, may fully

evince the intention of revocation, completely carried into effect by the testator; but the contents of the will offered here to be shewn in evidence, could not in my idea impair the validity of a will, solemnly executed one month afterwards. In this particular, a strong line of distinction is marked between the two cases; and in my view of the point under consideration, the contents of the antecedent will would not be *relevant* testimony in the cause then trying.

It has likewise been contended, that other declarations of the testator made shortly before and after the dates of both wills, ought to have gone to the jury, upon three grounds. 1st, That it has been the settled practice of this court to receive evidence of what either of the parties has said at and immediately before the execution of a written instrument; 2dly, That such evidence might have shewn a republication of the will of *August;* and 3dly, That it tended to prove a fraud committed on the testator.

We are left wholly in the dark as to the nature of those declarations, which the Court of Common Pleas refused as evidence; and here has been my greatest difficulty. Unless they were stated precisely on the trial, I do not see how that court could have decided on the propriety or impropriety of the testimony offered. That great latitude was allowed on the trial, to the declared intentions of the testator in favour of *Benjamin Havard* the now plaintiff in error, is very plain to any one who will barely inspect the testimony of *Sarah Havard*, and *John Jacobs*. Whether the testator had duly executed those favourable intentions in the only manner known to the law, was the question of fact then to be tried. I cannot for a moment suppose that the court below rejected evidence of the testator's declarations, tending to shew that he had republished the will of *August*, because this would have been a plain inconsistency on the very point upon which testimony had been before liberally admitted. Could I collect from the statement, that this had been their decision, I should have no hesitation in pronouncing it to be erroneous. Subscribing witnesses are not necessary under our law to a republication. But the act of setting up a former will, and the annulling of a latter will inconsistent therewith, and which contained an express clause of revocation of former wills, should be clear, plain, and unambiguous. I am per-

1810.

HAVARD
v.
DAVIS.

fectly aware, that artifices and address are often used to prevent the particulars of men's wills being made known, in order to preserve peace in their families; and that this caution more particularly obtains, where there are no lineal descendants, only collateral heirs depending on their bounty. In the words of *Chambre* Justice in *Longchamp* v. *Fish*, 5 *Bos. & Pul.* 420. "Testators are generally very averse "to have their intended dispositions of property made known "in their families before their deaths; and (blind) men, who "stand so much in need of attention from their relatives, "would probably be peculiarly averse to it. The remainder "of their lives, might in consequence of such disclosures, "be rendered completely uncomfortable. At all events they "might produce great discord in families." Lord Chancellor *Eldon* says, "few declarations deserve less credit than "those of men as to what they have done by their wills. "They wish to silence importunity, and to elude questions." 13 *Ves. jr.* 301. And Lord Chancellor *Erskine* has declared that "loose declarations of a testator, under circumstances "imposing upon him no obligation of veracity, are nothing." *Id.* 313.

The usage of *Pennsylvania* in admitting evidence of what passed at and immediately before the execution of a written instrument, is said to have arisen in this court before the *American* revolution, in *Hurst's Lessee* v. *Kirkbride* and *Riché*, and was founded on the case of *Harvey* v. *Harvey*, 2 *Cha. Ca.* 180. It was intended thereby to guard against frauds and mistakes, in which there would be relief granted in a Court of Chancery. 3 *Atk.* 77. 388. 1 *Ves.* 457. 2 *Ves.* 375. But I do not take the principle to be applicable to wills. The mistake of a testator cannot be rectified, because there is nothing to shew what would have been his intention, if there had been no mistake. 1 *Ves. jr.* 364. Want of knowledge of points of law, or the omission of part of a testator's property, are not circumstances sufficient to vitiate a will. 1 *Hen. and Munf.* 476., *Cas. Temp. Talb.* 240., 3 *Ves. jr.* 402., 4 *Bro. Par. Ca.* 179., 186. 13 *Ves. jr.* 376. If the scrivener who draws a will, uses such expressions as will pass an estate to a devisee different from what is intended by the testator, there is no remedy for the evil. *Litera scripta manet.* But in a contract between individuals, equity will redress the

mischief, where mistake has intervened. So in the common case of a bond from two persons drawn jointly, where the obligation was intended to be joint and several.

Here the bill of exceptions states, that these declarations were offered in evidence " for the purpose of shewing the " intention of the said *Samuel Havard* to dispose of his " estate differently from what was done by the said paper " writing read to the jury, and that he had made no such " writing as that read to the jury." How then are these words to be construed? If it was intended to bring forward the declarations of a man of fourscore years and upwards, made at different times, which, when connected together, would serve as distinct links in the chain of testimony, evincing a system of fraud and imposition practised against him; if it was meant to shew that the plaintiff below or his friends amused the old man with false pretences or other subtle contrivances, and by secluding him artfully from his other relations, either by circumvention or duress unduly influenced him to execute a will contrary to his own judgment, and to which his heart was an entire stanger, then such evidence would be clearly admissible; because under such circumstances it was no will in point of law. *Pow. on Dev.* 695. It has been determined in *Small's Lessee* v. *Allen*, 8 *Term Rep.* 147, that parol evidence might be given of questions asked by the testator at the time of executing his will, whether the contents were the same as those of a former will, to which he was answered in the affirmative, and was thus tricked into the execution of a will foreign from his mind. The rule of law, as well as of morals, unquestionably is, that no one shall derive a benefit from a fraud, practised either by himself or others to his own advantage. 2 *Vern.* 506. 699., 1 *P. Wms.* 288. It vacates all acts whatsoever.

But on the other hand, if these declarations were offered in evidence as indicative of the state of the testator's mind at the periods to which they refer, and tending to shew that at certain times his affections and inclinations were more strongly attached to his nephew *Benjamin Havard*, than to his other nephew *John Havard Davis*, and that his wish was that his landed property should not go out of the name of *Havard*, and from thence to deduce the inference, that the will

1810.

HAVARD
v.
DAVIS.

of *September* ceased to be valid, then I have no difficulty in asserting, that the testimony ought not to have been received. Such declarations cannot amount to the revocation of a will duly perfected, without some *act done* at the time, evincing the *animus revocandi*, or shewing not only a plain intention to republish a former will, but likewise really and truly carrying this intention into execution. The admission of them to a jury, would be in direct violation of the spirit or policy of our law, and would lead to the grossest frauds and perjuries. According to Lord Chancellor *Erskine* in the case already cited, " the mind of a testator is to be viewed not " through his *declarations* only, which are of no value com- " pared with his *acts*." 13 *Ves. jr.* 309. In the words of the act, as applied to personalty, " no will in writing shall be re- " pealed, nor shall any clause, devise or bequest therein, be " altered or changed by any words, or will by word of mouth " only, except &c." But the effect of the evidence thus offered, would be to shew, that the bent of the testator's mind varied from the instrument which he solemnly and knowingly executed.

From the summary of the evidence which I have taken, and the whole record, it appears to me that the natural import of the words used in the bill of exceptions, clearly leads to this latter purpose. Had the counsel for the defendant below conceived, that they had any reasonable grounds from which they might conclude that any trick or foul management had been committed on the testator, by the plaintiff or his father the executor, with respect to this will, or the republication of the former will, they would not have failed to have so expressed themselves in their exception; and had it been urged to the president of the court below, that the declarations of the testator were offered to establish fraud, undue influence or duress used towards him, I am fully persuaded there would have been little controversy respecting the admissibility of the testimony. Thinking as I do of the expressions in the bill of exceptions, I am of opinion that the judgment of the Court of Common Pleas be affirmed.

BRACKENRIDGE J. The issue before the jury in this case, involved two questions of *fact*, in their nature, divisible.

1. Is the writing of the 19th of *September* the will of *Samuel Havard?*

2. Is it the last will?

There is testimony which goes to the proof of his *hand-writing*, in which this will of the 19th is said to be, and which goes to the publication of it as a will. This proof is assailed, not *directly* by counter evidence, shewing it not to be his handwriting in the body of the will, or in the signature, or by evidence affecting the testimony of the subscribing witnesses, shewing them not to be of good character or of sound discernment, or to be interested; but *indirectly*, on the ground of circumstances, and by testimony to the declarations of the testator, inducing a presumption that it was not his will, or that it was not his last will.

Such evidence would seem to me to have been admissible. For it is not admitting parol evidence of a will, either as to the *making* it, or as to the contents of it, but of a fraud alleged in the production of a writing as a will, which is not.

I admit that testimony of declarations by the testator as to his intentions of disposing, or the harsh and unnatural character of the disposition he is alleged to have made, could weigh nothing to set aside the will, supposing it to have been made; but to disprove the making it. Nor could such testimony go a great way to the disproving it. But still it might go some length, connected with some circumstances already proved, which this is introduced to fortify. Here there is the circumstance of a former will containing contrary dispositions; and testimony inducing a presumption that this *former* will did *exist at the death of the testator*, and *that it came to the* hands of the plaintiff.

Taking it as proved, that the testator did make the will of the 19th of *September*, yet it may not have remained his last will, but may have been superseded by a republication of the former; which introduces the question, can parol proof be admitted of the *republication of a will?* If proof of the publication of a writing as a will may be by parol, proof of the republication may also be. I assume it to be the law of this state contrary to the law of *England*, and to come under the head of that " other proof" which is spoken of in the act of assembly, that proof of the publication of a writing as a will, may be by parol. If correct in this, the evidence offered

might warrant the jury, in concluding that the will of the 14th of *August* was republished subsequent to any publication of the will of the 19th *September;* and if so, it will destroy the existence of that of the 19th as a *last* will, though it may not establish that of the 14th as a will. For it is one thing to prove that a will of the 14th was republished and became a last will, and to prove what that will was, or to give evidence of the contents of it, for any other purpose than as it bears on the question in this case, which is, whether there was a will of the 19th of *September*, and whether that was the last will.

If, on this evidence, the existence of a writing of the 19th as a will, or as a last will, shall have been removed out of the minds of the jury by a conclusion in favour of that of the 14th, yet it will be another question, whether parol evidence shall be admitted to entitle the contents to probate, or to support the dispositions under it. For, even allowing it to be considered to be the law of *Pennsylvania*, that " other " proof" may be given of the making and publication of a will than the *attestation of subscribing witnesses*, yet proving the *contents* of that will is a *step beyond*, and is admitting parol proof to make a will. Fraud may be so far relieved against as to defeat the obtaining an advantage from it; but it may not be possible, consistent with general rules, to relieve from all injury by means of it.

If a copy of the will could be produced, the original being proved to have been lost, that safely might be established in the place of the original. But taking the *contents* from the memory of a witness, would not be within the meaning of that " other proof" which the act contemplates. But the question before us is not, whether parol proof shall be admitted of the contents of the will of the 14th, but whether the parol proof offered, ought to have been admitted for the purpose of destroying the will of the 19th as the last will, or as a will at all.

In support of the allegation that the will of the 19th is *supposititious*, the evidence is, that the father of the plaintiff *William Davis*, had in his possession the papers of the testator the day but one after the funeral, and a bond due from him to the testator, which is proved to have been amongst those papers but a short time before the

death of the testator, and of which the testator spoke as apprehensive that it might come to the hands of the plaintiff the son; from which a *presumption* arises that there may have been a spoliation of these papers. And there being proof that a writing did exist a short time before the death of the testator, purporting to be a *last will*, and with different subscribing witnesses, and that writing being deposited in the same desk with the bond so missing, a *presumption* arises, that this may have been suppressed by the purloiner of the *bond*, who had also an interest in suppressing this will of *August*, his son having an interest. Not, that I assume it, that these presumptions would justify the conclusion, and establish the fact of the suppression, and the fraud of a substituted will; but that it is evidence which is admissible in deciding on the question, and ought to have gone to the jury, who were alone competent to weigh the presumptions, and draw the conclusions. And the advantage of this could not be had, without going into proof of the writing alleged to be suppressed, and which purported to be a will, that is, into evidence of all circumstances relating to it.

As to the giving *notice* to the plaintiff, or to the executor, to produce this writing, before any evidence relating to it could be offered, if that were necessary, notice has been given; and the writing not being produced if it did exist, the next best evidence is that which has been offered, and which I think ought to have been admitted. I am therefore of opinion that the judgment of the Common Pleas be reversed.

Judgment reversed.