2 Wh 103
216    ¹340
——

[PHILADELPHIA, JANUARY 7th, 1837.]


JONES and Others *against* HARTLEY and Others.


IN ERROR.


1. In Pennsylvania, a will may be republished by parol.
2. Such republication must be proved by two witnesses; and the identity of the will spoken of by the testator with that produced, must be satisfactorily shown; but it is not necessary that the will should be present at the time of the republication; nor that the subscribing witnesses should prove the republication; nor need the declarations be made at the same time to the witnesses; and where evidence of such republication, by two or more competent witnesses is offered, it is error to refuse to allow it to go to the jury.
3. A conveyance of land expressed to be in trust for the payment of the debts of the grantor, and then to revert to him, is not such a disposition of the estate, as to revoke a previous will.
4. But parol evidence is not admissible in ejectment between the heirs at law of a decedent and a devisee in an alleged will, to prove that a conveyance made after the date of the will and absolute on its face, was in fact, made in trust to pay the debts of the grantor, with a resulting interest to him.


ON a writ of error to the District Court for the City and County of Philadelphia, it appeared that an action of ejectment was brought in that Court, by David Hartley, and Sarah Ann his wife, in her own right, Jane Pennell, and Edward Pennell, a minor, by N. R. Potts, his guardian, and John C. Jones, against Isaac H. Jones, Peter Weyant, Henry Moore, Isaac Rush, and others, to recover a certain tract of land in the county of Philadelphia.

At the trial before Judge STROUD, on the 28th of January, 1836, the plaintiff gave in evidence, a deed of conveyance of the property, executed by Isaac Jones to Thomas R. Tunis, bearing date the 13th of March, 1826, and a deed of conveyance executed by Thomas R. Tunis and wife, to Isaac Jones, bearing date the 9th of May,

1828; and then called Adam Britz, who being duly sworn, deposed and said: "That he had known Isaac Jones, deceased, for fifty-two years—that he left two sons, John C. Jones, and Isaac H. Jones; a grandson by his daughter Deborah, called Isaac Rush, being by her first husband; and three grandchildren by the same daughter Deborah, by a second husband, to wit, Edward, Sarah Ann, and Jane Pennel : one of the last mentioned children, to wit, Sarah Ann, married David Hartley, and is since dead about two years ago"— and here the plaintiffs' counsel rested their case.

The counsel for the defendants, then offered in evidence, a will executed by Isaac Jones, the deceased ancestor, bearing date the 15th day of January, 1807, and proved before the register of the city and county of Philadelphia, on the 1st day of June, 1830; and gave in evidence, certain documents filed in the office of the register, to wit, the renunciations of Jeremiah Woolston, Moses Ray, and William West, to act as executors of the said will; letters of administration granted to John C. Jones, and Isaac H. Jones, dated the 7th January, 1830 ; appeal of John C. Jones, from *probate of wills,* dated 23d of June, 1830 ; a withdrawal of said appeal by John C. Jones, dated 31st December, 1830 ; the administration bond given by John C. Jones, and Isaac H. Jones, dated 7th January, 1830; and to prove a republication of the said will of the said Isaac Jones, after the execution of the said deed to Thomas R. Tunis, and the said deed of Thomas R. Tunis to Isaac Jones, bearing date the 19th of May, 1828 ; the defendants' counsel proposed to examine witnesses, whose testimony to the Court was as follows :

Samuel Buzines.—"I reside in the state of Delaware, New Castle county, near Wilmington, on Brandywine. I was acquainted with old Isaac Jones—he owned property in my neighbourhood—a snuff mill, barley mill, grist mill, two farms adjoining, a number of lots adjoining the farms, and some north, that did not adjoin the farms. He often came down there to attend his business, and boarded at James Cahender's, where the snuff mill was. He died in the last of the year 1829. During the latter part of his life, he had taken a house-keeper, and lived on his farm. I saw him frequently during the summer and fall of 1829, and had conversations with him in relation to his will, which were introduced by himself. Either in the month of October or November of that year, 1829— certainly in the fall, a few days previous to his leaving Delaware for Philadelphia the last time, I was going from my house down to the mills, where I worked, I met him a few rods from the end of his own lane, turning down towards my house. He was in a low state, having been sick for some time ; his ankles and feet were much swollen, and he could scarcely move about. He said, 'I am glad enough to go any where to get out of the noise of old Jane Pennell,' who was his house-keeper at the time, 'she is steady harping and

deviling at me to make a new will, and cut off my poor unfortunate son Isaac,' which he added with an oath, he never would do. That is the last I heard him say about it, but before I had heard him say a great deal more. The first time I knew him, was in 1822. We had frequent conversations about his will, from 1826, down to 1829. In 1826, I heard him say that he had made a conveyance to Mr. Tunis, and that Mr. Tunis had re-conveyed to him. After this re-conveyance, I frequently heard him say that he intended that will to stand. I was the first to inform Mr. Jones of the death of Mr. Tunis, having received my information at Brandywine, from Wm. M'Cauley—he said he was sorry to hear of his death; but, thank God, his affairs were out of his hands, and it would not interfere with his former arrangements. I have frequently, after that, heard him say that he intended his will of 1807, to stand. The contents of the will, he said were, that he had left John C. Jones barely enough to prevent his breaking the will—if any body mentioned John C. Jones to him, he would fly out angrily, and disown him—he had left also a certain property in Buttonwood Lane, to his daughter Debby Rush—a legacy to his wife Sarah Jones—and all the rest that he had in that day, he had willed to his son, Isaac H. Jones. I have frequently heard him say, between 1826, 1827, and 1829, and his death, that if he died in his senses, his son Isaac H. should have all his property, and stated to me his reasons. His reasons were, that John C. Jones had spent so much money by endorsements, and his abuse to him by his own tongue after he had turned him out of his partnership. He said that when John C. Jones found that he could get no more money out of him, he got his brother Isaac H., who was then a minor, and apprentice under Mr. Pratt, at book-keeping, to indorse a note in the name of Isaac Jones, to be discounted in bank, for 500 or $600, promising his brother, to pay it before it became due, and that his father should know nothing of it—after long persuasions, Isaac H. did it, having confidence in his brother, that he would not deceive him—when the note became due, it was sent to the old man; he had it protested; said it was not his signature, but that of his son Isaac, and refused to pay it—they sent the marshal after him, and then he agreed to pay it, sooner than have his son harrassed. He then said that he went to John C. Jones, to inquire of him how he came to take his son in, in such a manner—that John treated him with great rudeness and violence. This, he said, was the cause of his making his will. I have heard him say these things frequently; in 1827, 1828, 1826, and 1825. I never heard him speak of any other will, than this one of 1807—only, as I have stated, that he was urged in his latter days, to make another will, but said he never would. He never told me, who wrote out the will of 1807, for him, nor did I ever see it." Being cross-examined, this witness stated various other facts; among others, these: " That he was called before the arbitrators in this cause, in February,

1833 or 1834, and that he then swore, that for two years before his death, old Isaac Jones was childish, and incompetent to transact business of importance; that is, between his tenants and his debtors, and himself; and that he thought so still.—I have heard old Isaac Jones say, his son Isaac H. Jones had used the name of the firm of Isaac Jones & Son, to the amount he supposed, of $1000, and at other times, $17,000, upon notes that he (Isaac H.) drew for the purchase of lottery tickets. After which the partnership was dissolved, and I am informed Isaac H. took to drink. This was in 1825 or 1826."

Margaret Stedham.—" I reside in the state of Delaware, about a mile or a little more from the property of old Isaac Jones. I knew the old man well. I last saw him in the latter part of October or beginning of November 1829. I had seen him almost every day during the summer and fall of that year. Had known him about ten years. I conversed with him about his will the day before he left Delaware. He came to my house—called me into the entry—asked me twice what I thought—said he, you recollect Jane Pennell has been teazing me to alter my will—I said in what way? He answered, to leave my unfortunate son Isaac only a bare living, and that to be handed to him only as he would occasionally stand in need, and then to leave all he had to those Pennell children, and that he said he never would no—for, he said, his will was made many years ago, and his will should never be broke—this he said with an oath and he bade me good morning. It was, as he said, Jane Pennell that wished him to alter that will. I had spoken to him on that same subject before that day. The reason, he said, he disannulled John, was his base conduct. I heard him scores of times speak on the subject of his will—such as how John had abused him—and what he had left him—he said he left him five dollars and a walnut coffin. This he told me within two or three years of his death, and down to one year before his death. Then he related about these Pennell children—said he had schooled them—had given Sally Ann a trade, put Edward to a trade; and Jane he intended to school and put her to a trade; and that was all he ever intended to do for them—for all he had then left over was for his son Isaac." Being cross-examined, this witness also stated other facts.

John K. Stedham.—" I heard old Isaac Jones frequently talk about his will. He said he had made a will—had willed his son John five dollars and a walnut coffin—a proportion of his estate, Spring Garden property, to Debby Pennell—there was another heir, Isaac R. Jones, I think, who was left a lot in Wilmington, and Isaac H. Jones was, as I understood him, to have all the rest. I think he named 1807 or 1806, as the year in which he had made this will. This was the only will I ever heard of, until after his death. He often spoke of this. Whenever he would get a little vexed about

his losses and troubles, he would break out on this subject. At one time he had gone to Baltimore, and John C. Jones came to my house—I did not know of his quarrel with his father, and when the old man came back he gave me a terrible scolding about harboring John, and then began to tell me all about his will. This was in 1822. He stated it frequently to me down to the time of his death. I mean the contents of his will." Being cross-examined, this witness stated other facts—among the rest, that it was quite likely.he stated, when examined before the arbitrators, that old Jones was childless.

George Buzines.—" I knew old Isaac Jones—I was in his employ in March, 1822. I left him, and returned to him in 1828. In the fall of 1828 I was down at the mill—the old man and I sat on a log conversing—I asked him for some money—he began to put up a poor mouth about not having any, which he had often done before. Then he began to lament his case concerning his son John C. Jones and Ned Pennell. He told me, that as for John C. Jones, he never should inherit any of his property, nor Ned Pennell's children—that he intended all that property for his son Isaac H. Jones. I never saw him after that."

To all which testimony the counsel for the plaintiffs objected, and the Judge refused to allow it to go to the jury; to which decision the defendant's counsel objected.

The counsel for the defendant then offered to prove by parol.evidence, " that the conveyance from Isaac H. Jones to Thomas R. Tunis, dated the 13th of March 1826, was in trust to raise a certain sum of money to pay the debts of Isaac Jones, and after the accomplishment of that object, to re-convey the same to the grantor;" to the admission of which testimony the counsel for the plaintiffs objected, and the Court over-ruled the evidence; to which decision also, the defendant's counsel excepted.

The jury, under the direction of the Court, found for the plaintiffs; whereupon the defendants removed the record to this Court, and assigned the following errors :—

" *First,* The Court below erred in refusing to allow the counsel for the defendants to read the will to the jury.

*Second,* The Court below erred in refusing to permit the defendants' counsel to prove by parol evidence, that the conveyance from Isaac Jones to Thomas R. Tunis, dated the 13th of March 1826, was in trust to raise a certain sum of money to pay the debts of the said Isaac Jones, and after the accomplishment of that object, to re-convey the same to the grantor."

Mr. *Jack* and Mr. *Dallas,* (with whom was Mr. *Rawle,*) for the plaintiffs in error.

(Jones *v.* Hartley.)

1. The judge who tried this cause below, rejected all the evidence offered by us to prove the republication of the will, and refused to allow the will to go to the jury. In this we contend that there was error. The question is, how far it is necessary to identify the will by the testimony of witnesses. In *Havard v. Davis,* (2 *Binn.* 414,) it was held that declarations of a testator, that a will dated in *March* 1806, was his last will, were admissible as evidence of republication of that will, so as to revoke a will made in September, 1806. Here there was the requisite number of witnesses. No particular form of republication was necessary. These witnesses identify the instrument by date, circumstances, and contents. In *Hock v. Hock,* (6 *Serg. & Rawle,* 48,) the present Chief Justice says, " If the testator in his conversation with Rodernell had mentioned the substance of the contents of the will, or if it had been shown to have been found among his papers at his death, there would have been at least a circumstance to leave to the jury for the purpose of connecting his declarations with the paper in question." Here the evidence offered came within the rule laid down by the Chief Justice. In *Havard* v. *Davis,* Chief Justice TILGHMAN says, " It should have been left to the jury to decide whether the will was republished." (2 *Binn.* 416 ;) and such also was the opinion of Judge BRACKENRIDGE, (p. 427.) So in *Musser* v. *Curry,* (3 *Wash. C. C. Rep.* 481,) and *Reynolds* v. *Reynolds,* (16 *Serg. & Rawle,* 85.) In *Clark* v. *Morton,* (5 *Rawle,* 241,) the absence of the *corpus* of the will was relied on. Here the *corpus* of the will was in court. *Burns* v. *Burns,* (4 *Serg. & Rawle,* 297.) There is no case to be found where the republication was held to require the same formalities as the original will. The existence of the will, carefully preserved by the testator, furnishes strong evidence of his intentions with respect to the republication. The following cases were also cited upon the question of republication. *Thompson* v. *White,* (1 *Dall.* 424.) *M'Dermot* v. *The Union Ins. Co.* (3 *Serg. & Rawle,* 609.) *Frederick* v. *Campbell,* (14 *Serg. & Rawle,* 293.) *Bollinger* v. *Eckert,* ( 16 *Serg. & Rawle,* 422.) [HUSTON, J.—That case is imperfectly reported. Part only of my opinion is given. The remainder seems to have been lost.] *Ingham* v. *Crary,* (1 *Penn. Rep.* 389.) *Krider* v. *Lafferty,* (1 *Wharton's Rep.* 303.) *Duppo* v. *Mayo,* (1 *Saunders,* 276, note 4.) 7 *Bac. Abr.* 320, tit. *Republication. Kemble* v. *Stafford,* (2 *East,* 543.) *Brady* v. *Cubit,* ( 1 *Douglas,* 31.) *Roll. Abr.* 617, pl. 1 § 30, § 50. *Moore,* 429. *Dyer,* 143. *Cro. Eliz.* 493. 1 *Ld. Rayd.* 441 ; 1 *Smith's Laws,* 392, note on the statute of frauds.

2. We contend that the evidence offered was admissible to show that the will was not revoked by the deed of 1826. That instrument, it is true, purported on its face to be an absolute conveyance; but it was in fact made upon trust to raise money to pay the debts of the grantor. Now, parol evidence has frequently been admitted to

(Jones v. Hartley.)

show that an apparently absolute conveyance was in fact made in trust. Here the judge rejected every thing that was offered, whether to prove fraud or mistake, and without any distinction as to the time at which the declarations were made. Then we contend, that if the trust was established, the will was not revoked ; and hence the evidence became material. The reasons which have operated upon the courts to declare a will revoked by a conveyance, although the grantor takes the estate back again, do not apply to the case of a conveyance or trust where any thing results to the grantor, especially where the legal estate has been reconveyed, as has been the case here. In fact, the conveyance to Tunis was nothing more than a mortgage for the payment of debts; in which case it is settled that a prior will is not revoked. *Cozens* v. *Stevenson,* (5 *Serg. & Rawle,* 426.) *Cowden* v. *Reynolds,* (12 *Serg. & Rawle,* 281.) *Skerret* v. *Burd,* (1 *Wharton's Rep.* 250.) 1 *Vernon,* 329, 342, &c. 1 *Salkeld,* 158. *Roper on Wills,* 80. 2 *Christ. Blackst.* 373. 3 *Peere, Wms.* 170. *Swift* v. *Neale,* (3 *Burr. Rep.* 1490.) *Brydges* v. *The Duchess of Chandos,* (2 *Ves. jr.* 428.) *Vernon* v. *Jones,* (*Id.* 241.) *Dixon* v. *Gibson,* (*Id.* 602.) *Cunningham* v. *Melish,* (*Prec. in Chancery,* 31.)

Mr. *C. Ingersoll* and Mr. *Budd,* (with whom was Mr. *C. J. Ingersoll,*) for the defendants in error.

1. Was there sufficient evidence offered to bring the case before the jury? It is to be remarked that there was no. evidence of the *factum* of republication. All the cases agree that there must be the same evidence of republication as of the original publication. This is said by Judge WASHINGTON, in *Musser* v. *Curry,* cited on the other side. It was for the judge to say in the first instance, if there was any evidence to identify the will. *Berks and Dauphin Co.* v. *Myers,* (6 *Serg. & Rawle,* 12.) *Sigfried* v. *Levan,* (*Id.* 308.) *Commissioners* v. *Ross,* (3 *Binn.* 542.) *M'Corkle* v. *Binns,* (5 *Binn.* 548.) *Cowden* v. *Reynolds,* (12 *Serg. & Rawle,* 284.) In this case there was nothing to identify any particular paper. The case of *Reynolds* v. *Reynolds,* (16 *Serg. & Rawle,* 82,) shows what evidence is necessary. It is not true that the will was found among the papers of the deceased. It is not probable that he would would have gone into another state to find witnesses to prove the republication; and there must be an *animus republicandi* at the time. It must be admitted that the cases as to the evidence of republication are contradictory. There are many, however, which support the view taken by the Judge of the District Court. *Bunker* v. *Cook,* (*Fitzgibbon,* 229.) 2 *Dyer,* 143, (*a*) (*b*), 142 (*b*). 1 *Roll. Abr.* 618, tit. *Devise,* pl. 7, 8. *Fuller* v. *Fuller,* (*Moore,* 353.) Republication may, it is not denied, be by parol, but then it must fix and point out the paper.

2. The Court was right in rejecting parol evidence of what would

(Jones *v.* Hartley.)

have been irrelevant if admitted. The conveyance was an alteration of the estate ; and any alteration in the estate or interest of the testator, is held to be an implied revocation. 4 *Kent's Comm.* 528, 9. Equity has interposed only in two cases; 1st. In case of a direct mortgage ; and 2d, where the conveyance is merely for payment of debts. The reason given for the last exception is, that the conveyance is in fact, no more than a mortgage. *Sparrow* v. *Hardcastle,* (3 *Atkyns,* 805.) *Bridges* v. *Duchess of Chandos,* (2 *Ves. jr.,* 428.) *Temple* v. *The same,* (3 *Ves.* 689, 690.) *Harwood* v. *Oglander,* (6 *Ves.* 222 ; *S. C.* 8 *Ves.* 128.) *Abney* v. *Miller,* (2 *Atkyns,* 599.) *Barns* v. *Crouse,* (1 *Ves.* 497.) *Strype* v. *Cooper,* (1 *Eng. Eccles. Rep.* 92, 712.) 4 *Com. Dig.* 134, 5. 1 *Williams on Ex'rs.,* 92. *Nodier* v. *Griffiths,* (4 *Burr.* 1960.) *Lewis* v. *Lewis,* (6 *Serg. & Rawle,* 489.)

The opinion of the Court was delivered by

SERGEANT, J.—It is the opinion of this Court, that there was error in refusing to permit the will to be read to the jury.

The rule of law is, that the republication of a will must be accompanied by the same solemnities as were necessary to the publication in the first instance, (2 *Binn.* 419 ;) but no others are required. Hence, in England, since the statute of frauds, requiring a will to be in writing signed by the party, and to be attested and subscribed in his presence by three witnesses, a parol republication is not good ; but in Pennsylvania, the witnesses to a will need not be subscribing witnesses. If there be a will in writing, signed by the testator, it is sufficient that it be proved by any two witnesses who can establish the fact, whether they attested as witnesses or not. As therefore the original proof of the will may be by parol, so may the proof of republication ; but the number of witnesses must be the same. In this respect, our law stands on the footing of the English law, under the statute 32 Hen. 8th, prior to the statute of frauds ; and under the statute of Hen. 8th, the decisions in England were uniform in favour of receiving parol evidence of the republication of a will in writing ; and it was held that any thing which expressed the testator's intention that the will should be considered as of a subsequent date, was sufficient. 1 *Ves. jr.,* 497. 1 *Vern.* 330. 2 *Vern.* 209. 2 *Roll. Ab.* 618. 1 *Freem.* 264. 2 *Ch. Rep.* 138, 140. This is indeed not an open question now ; for those principles were all recognised and acted upon by this Court in the case of *Havard* v. *Davis,* (2 *Binn.* 406,) in which the subject was fully discussed by counsel, and carefully considered by the court. In that case, declarations by a testator, not long before his death, that a will dated in August, 1806, was his last will, were held to be evidence of republication of it, so as to produce a revocation of a will dated in September, 1806, revoking all prior wills, and to set up the first will in its stead. That

(Jones *v.* Hartley.)

was a stronger case than the present, for it was to revoke a will deliberately made, and when the intention of the testator to revoke it was undoubted; here the revocation is rather a presumed or implied one. In principle, however, the cases are the same, and I think that decision must be considered as settling the doctrine that parol evidence of republication is proper in Pennsylvania, with the requisition however, that the proof of the republication be by the same number of witnesses, and be as conclusive of the fact as would be required to establish an original will. The *animus republicandi* must be shown, that is, it must be shown that it was the intention of the testator at that time, that the will in question was and should be his will. The *identity* of the will must be shown, or in other words, that the will produced is the same will to which the testator referred his declarations. The witnesses need not be called for the purpose, for that is not required in order to establish an original will; nor need the will be present at the time of such declarations. In *Havard* v. *Davis,* only one of the two witnesses saw the will, and that not by the testator's directions. In *Colton* v. *Colton,* (2 *Vern.* 209;) 1 *Freem.* 264; 2 *Ch. Rep.* 138, 140, S. C.; the testator's declarations were made in conversation, the will not being redelivered nor present. Nor need declarations be at the same time to the witnesses; they may be to one on one day, and to another on the next. It is sufficient if they satisfactorily show that after the date of the revocation, the testator declared his intention that the writing was his last will, and that fact is proved by two competent witnesses to the satisfaction of the jury. The evidence however, ought to be clear and satisfactory, to establish this intention, as well as the identity of the writing referred to; as the fact is to depend on parol evidence, and there is no written evidence to establish the republication.

2. On the other point, we are of opinion that the deed was a revocation of the will.

The general principle on this subject, will be found in the case of *Skerrett* v. *Burd,* lately decided by this Court, (1 *Whart.* 250.) It has been strongly urged, that the present being a conveyance in trust for the payment of debts, and then to result to the grantor, was such a partial disposition of the estate, as brings it within the excepted cases. And if the alleged purpose of the conveyance appeared on the face of the deed, it would be so; but the difficulty here is, that this grant and disposition of the estate is on the face of the deed absolute; the trust is no more than an understanding between the parties at the time, which it is alleged was omitted in the deed by mistake, and which is to be established by parol proof. We have, it is true, uniformly admitted parol evidence of what passed at the time, to vary or explain a deed or writing, in cases of mistake, fraud or trust, and even to reform the deed or writing accordingly, where the justice of the case required it. But this has been done only between the parties, for the purpose of obtaining justice between them. It has

not been done where the dispute was between third persons; as in this case where one side claims under the will, and the other side by inheritance.  We cannot in such case convert a deed which is absolute on its face into a conditional deed or deed of trust, and thus alter its nature and character to effect the interests of others: as to them it must remain what it purports to be.  It is then, if the parol evidence be made out, an entire disposition of the whole estate; an absolute parting with the owner's interest, reserving an equity on his part which he might enforce or not at his pleasure, of compelling the grantor to account, and to enforce recovery when the trust should be fulfilled; but it is not the case of a mortgage or conveyance for the partial purpose, on its face, of payment of debts, which are excepted cases, because they amount to no more than a charge on the estate, not a transfer of it.  Here there is a transfer, and a total alienation, and the right to set up a trust by parol between the parties, if they choose to do so, but not necessarily existing as to third persons, whose rights depend on the character of the conveyance.  Being then a complete alienation of the real estate after the date of the will, it is a revocation of the will so far as relates to the property thus conveyed.  But on the first point the judgment must be reversed.

Judgment reversed, and *venire facie de novo* awarded.