# SURROGATE'S COURT, DELAWARE COUNTY.

In the Matter of the probate of the last will and testament of WILLIAM SIMPSON, deceased.

*Will — lost or destroyed codicil — Surrogate's power as to — effect of destruction of codicil as to revival of will — effect of acts and declarations of testator at time of such destruction — Parol republication.*

S. made his will in 1871, disposing of his entire estate; in 1872 he executed a codicil making a different disposition of personalty to the amount of $50,000; in 1876 he burned the codicil with the intention of revoking it; he then held the will of 1871 in his hand and declared in the presence of two witnesses: "This is my last will and testament, I shall never make another;" wrote a direction to his executors referring to the will as his last will, inclosed it and the will in an envelope and wrote upon it: "The last will of William Simpson, dated August 18, 1871;" sealed the envelope so that it could not be opened without detection, and carefully preserved it among his valuable papers until his death. Upon proceedings being taken by the next of kin within one year after its probate to contest its validity and the competency of its proofs. *Held:*

(1.) That in proceedings to prove a will the surrogate has power to inquire whether a subsequent testamentary instrument has not been executed revoking the will propounded. even though such subsequent will may have been lost or destroyed.

Such power is necessarily implied in the jurisdiction given to the surrogate to determine whether the instrument submitted for probate is the *last* will of the testator.

(2.) Where a codicil impliedly revokes a will in part, by reason of inconsistent provisions, the destruction of the codicil *animo revocandi*, revives the provisions of the will revoked by its execution.

Such a codicil is not a "second will" within the provisions of section 51, 3 Revised Statutes (6*th* ed., *p.* 65), which declares that the destruction of a "second will" shall not, *ipso facto*, revive a former will.

(3.) Where a second will is revoked by destroying it, acts and declarations of the testator accompanying the destruction, evincing an intention to

revive and give effect to a former will, are not sufficient for that purpose unless they amount to a republication of the former will.

(4.) A parol republication of a revoked will, if made in the presence of two witnesses, is valid.

Re-execution and reattestation are not necessary.

Prior to the Revised Statutes a will of personalty in this state and in England could always be republished by parol. It was otherwise with respect to a will of lands, which, after the statute of frauds (29 *Car.*, 2, *c.* 3), could not be republished except by an instrument, in writing, attested by three witnesses. Nor was any particular form of· words required to constitute a good publication of any will, or a republication of a will of personalty.

Any thing which indicated a present intention on the part of the testator that the instrument should operate as his will was sufficient.

The Revised Statutes have so far changed this rule as to require in the case of all wills a parol declaration of the testator in the presence of two witnesses that the instrument signed by him is his last will and testament and to that extent only have modified the requirements necessary to con_ stitute a valid publication or republication of a will.

*October*, 1878.

*L. L. Bundy* and *F. R. Gilbert*, for proponents and Daniel Simpson, a legatee.

*E. M. Morse* and *H. O. Cheesebro*, for contestant.

I. H. MAYNARD, *Surrogate.* — This was a proceeding brought by Alma Virgil, a sister of the testator, under the statute relating to the probate of wills of personal propĕrty, to contest the validity and the probate of the will of· William Simpson, deceased, late of Davenport, in ·this county. The main facts, upon which the principal questions arise, are these :

The testator duly executed his will August 18, 1871, giving his entire estate, valued at $100,000 and upward, to his wife, the proponent, Emeline Simpson (who is also appointed executrix), excepting $10,000, which he gave to his brother, Daniel Simpson. At this time the testator, then sixty-two years of age, was in feeble health, and his wife, who was six years· his junior, was in good health. On the 13th day of

Matter of Simpson.

April, 1872, his wife, then being seriously ill, and not expected to survive long, he duly executed a codicil to this will, in which he gave various legacies, amounting in all to about $50,000, to his brothers and sisters, and other relatives, and to different charitable and religious purposes, and for the preparation of a burial place and the erection of a monument.

The evidence fails to establish the exact amount of each legacy excepting that there was given to his executors, in trust, the sum of $10,000, for the erection of a church at his place of residence, and the sum of $5,000 to provide a burial place for himself and family, and for a monument.

The codicil was drawn by James Stewart, Esq., a son of his wife's brother, a lawyer, and one of the proponents here, and an executor named in the will of 1871.

He was called as a witness by the contestant, and testified to the fact of the execution of the codicil; that he had no doubt that it was duly executed and attested, and that all the formalities required by law had been strictly complied with, but he was unable to give the names of the witnesses to it, or any definite information as to its contents further than above stated. The contestant being thus unable to ascertain the names of the witnesses to the codicil, they were not produced or examined upon the hearing of this matter.

In May, 1876, the testator's wife having recovered, and being himself in feeble health, he destroyed this codicil by putting it in the stove and burning it up in the presence of his wife and Mr. Stewart. Previously to doing so the will and codicil had both been read by Mr. Stewart at the testator's request, and then taking them both in his hand he said: "I am going to destroy this codicil and do it now," and immediately accompanied this declaration with the act of destruction. Immediately afterward he held the will of 1871 up in his hand and declared, in the presence of his wife and Mr. Stewart, "this is my last will and testament, I shall never make another," and he then wrote a request or direction to his executors to pay his brother Daniel, one year after his death,

Matter of Simpson.

$10,000, in addition to the $10,000 "named in my last will and testament, dated and made the 18th day of August, 1871," and inclosed this direction with the will of 1871 in an envelope, sealed it, made certain marks across the seal so that it could not be broken open without detection, and wrote upon the envelope, "last will of William Simpson, dated August 18th, 1871," and caused it to be placed among his valuable papers and carefully preserved until his death. He died, December 23, 1876, without issue. This will was afterwards admitted to probate by the surrogate of Delaware county, February 27, 1877, without objection, and within one year thereafter the contestant filed allegations against its probate and then instituted this proceeding. It is conceded that the will of 1871 was properly executed; that the execution of the codicil of 1872 revoked the will by implication in so far as the provisions of the codicil were inconsistent with those of the will, and that the destruction of the codicil operated as a revocation of that instrument; and upon the facts proven the contestant insists upon the following propositions which demand consideration.

First, that the destruction and consequent revocation of the codicil, did not operate, *ipso facto*, to revive the provisions of the will which had been revoked by it.

Second, that the acts and declarations of the testator at the time of the destruction of the codicil, although evincing an intention to revive and give effect to the will of 1871, were not sufficient for that purpose; that nothing short of a written instrument executed with all the formalities required for the execution of a valid will, could be effectual to restore the provisions of the will impliedly revoked by the execution of the codicil.

Third, that the will of 1871, could not be republished by parol, and that since the adoption of the Revised Statutes, a will cannot be duly republished unless it is re-executed and reattested with all the formalities with which it was originally executed.

Matter of Simpson.

I will consider these questions in the order in which they are stated; but it first becomes necessary to dispose of a preliminary point raised by the proponents.

They insist that the surrogate has no jurisdiction to take proof of the execution of the codicil, or of its provisions, or of its destruction, on the ground that by the provisions of the Revised Statutes (*vol.* 3 [*6th ed.*], *secs.* 95 – 100, *pp.* 71–72) the supreme court has exclusive jurisdiction to take proof of the execution, and validity of a lost or destroyed will, and to establish the same; and that the surrogate can take no proceedings in regard thereto, until a decree of the supreme court has been obtained establishing the lost or destroyed will.

This proposition does not seem to be tenable. Undoubtedly, when the object of the proceeding is to establish the lost or destroyed instrument as a valid testamentary disposition of the testator's property, existing at the time of his death, the surrogate has no jurisdiction to determine that question; but under the statute the proceedings for that purpose should be taken in the supreme court. But where the issue to be determined by the surrogate, is whether a written instrument propounded for probate is the last will of the testator, it follows, of necessity, that he has jurisdiction to inquire whether a subsequent testamentary document revoking the will in question had not been executed, even though it may have been lost or destroyed.

The question, which above all others, the surrogate has exclusive jurisdiction to hear and determine, is whether the instrument propounded is the *last* will of the decedent, and he must, by implication, have jurisdiction to determine all subsidiary questions involved in it. The instrument in controversy cannot be the testator's last will, if a subsequent will has been executed revoking it wholly or in part; and if the latter happened to be destroyed and the surrogate is precluded from inquiring as to its execution, he would be compelled to declare that to be the testator's last will which confessedly was not so.

I am supported in this view by the case of *Nelson* agt.

*McGiffert* (3 *Barb. Ch.*, 158), which holds that upon the probate of a will the surrogate has jurisdiction and power to receive proof that such will had been revoked by a subsequent will of the testator which had been destroyed. In that case the evidence, with reference to the execution of the destroyed will, was closely analogous to that in this case, but there was no proof whatever as to the contents of the destroyed will, or that it contained any provisions inconsistent with or revoking the former will. And it was, therefore, also held that the execution of the subsequent will did not of itself revoke the prior will without proof that it contained inconsistent provisions or a revoking clause.

The true rule seems to be, that where it is necessary to take proof of a destroyed subsequent will for the purpose of determining whether the instrument submitted for probate was the testator's last will, the surrogate has power to hear the evidence and determine that question, but where the object of the evidence is to establish the destroyed subsequent will as a testamentary disposition of the testator's estate valid and effectual for that purpose at the time of his death, then the surrogate is deprived of jurisdiction and resort must be had to the supreme court.

Nor do I see any difficulty under this rule of the kind suggested by proponent's counsel in entering the proper decree in such cases. If I should find in this case that as to that portion of the testator's estate disposed of by the codicil of 1872 the will of 1871 was revoked, and he so far died intestate, a decree could be entered admitting the will of 1871 to probate as a will of the testator's real and personal estate, except as to that portion of his estate disposed of by the codicil of 1872, and that as to that part of his estate and in another tribunal, necessary if, what the dispositions of the codicil were.

I am thus brought to a review of the questions raised by the contestant the first of which is, that the destruction of the codicil, *animo revocandi*, did not, of itself, revive the provisions

of the will which had been impliedly revoked by its execution. This seems to have been tacitly conceded upon the argument by the proponent's counsel, but I am not prepared to give an unqualified assent to the soundness of the proposition. It depends upon the construction to be placed upon sections 51 (formerly 53) and 103 (formerly 71) of the Statute of Wills (6th. ed.).

Section 103 provides that "the term 'will' as used in this chapter *shall include all codicils* as well as wills." And section 51 provides that "if after making of any will the testator shall duly make and execute a second will, the destruction, canceling, or revocation of such second will, shall not revive the first will, unless," &c.

The contestant's counsel claim that by force of the one hundred and third section, the term "second will" in the fifty-first section may be regarded as of equivalent import with that of a codicil to the first will, and that the section is to receive the same construction as if it read: "If after the making of any will the testator shall duly make and execute a second will *or a codicil to the first will*, the destruction, canceling or revocation of such second will or of such codicil shall not revive the first will," &c.

This does not seem to be the true construction to be placed upon these sections. The declarations in the one hundred and third section is not that the term will, shall be synonymous with that of codicil, and hence that whenever used in that chapter it could be replaced by the term codicil and the meaning preserved, but it simply provides that in the term will, shall be embraced all codicils to a will, so that wherever the word will is used it shall have the same effect as if it had been written "a will and all codicils to it" to avoid the necessity of a repetition.

It would be doing violence to the language of section fifty-one to hold that the phrase "second will" shall be construed to mean in any case simply a codicil to the first will. It evidently refers to a testamentary instrument which assumes to

dispose of the testator's entire estate, and not to an instrument which is merely an addition or supplement to a former will; and which has no legal entity independent of the existence of the latter. This is the view taken by the reporter in a foot note to *Simmons* agt. *Simmons* (26 *Barb.*, at page 76), where he says, referring to this very section. —

"The revisers here manifestly use the word 'will' (unqualified) as *ex vi termini*, meaning a complete disposition of the testator's whole property and therefore any second one is necessarily a revocation of any former will." If this is so then the rule of the common law is still in force in this state, which holds that the destruction of a codicil which only by implication revoked a former will in part by reason of inconsistent provisions, does, *ipso facto*, revive the revoked portions of the will (*Powell on Dev.*, 549; *Perkins*, sec. 479; 4 *Burr*, 2512; 1 *Redfield on Wills*, pp. 375–77).

And so, in the present case, the destruction, by the testator, of the codicil of 1872 would leave the will of 1871 in full force and effect to the same extent as if the codicil had never been executed.

The next question raised by the contestant is, that the acts and declarations of the testator, at the time of the destruction of the codicil, although clearly manifesting an intention to revive the will of 1871, in its original integrity, were not sufficient to accomplish that object, and that the provision in section 51, above referred to, that "the destruction, canceling, or revocation of such second will, shall not revive the first will, *unless it appears by the terms of such revocation*, that it was his intention to revive and give effect to his first will," etc., only applies to a case where the second will has been revoked by a written revocation, which also declares the testator's intention to revive the former will.

There is great force in their argument upon this point. By section 40, three methods of revoking a will are provided for; by destruction, by cancellation, and by some other writing of the testator declaring such revocation, and executed with the

Matter of Simpson.

same formalities as the will itself.    These methods are all evi dently referred to in section 51, and if the term " revocation," as used in the first clause of this section, does not refer to a written revocation alone as contradistinguished from a revo cation by destruction or cancellation, and is to be deemed to comprise every method of revocation, then the terms " destruc tion " and " canceling," are entirely superfluous and meaning less ; and if the term as there used is to be limited to a revo cation by a written instrument, it would be a violent construc tion to say, that when again used in the same section and in the same sentence, too, it is not to be given the same legal signification.    If the revisers or the legislature intended that " revocation " when last used in this section should include a revocation by destruction or cancellation, they have been most unfortunate in the choice of language, to express such inten tion.    The phrase " unless it appears *by the terms* of such revocations," &c., is peculiarly apt, if a revocation by a written instrument is intended, but utterly inappropriate if designed to apply to a case of revocation by destruction or cancellation.

But the most interesting and important question in this case arises upon the construction to be given to the last clause of the fifty-first section, which provides in substance for the revi val of a former will, in case the testator, after the destruction of the second will " *shall duly republish his first will.* "

What, then, is necessary to constitute a valid republication of a revoked will ?    If the acts of the testator, and his parol declara tions in the presence of witnesses, can be, in any instance, sufficient for that purpose, it is conceded that a republication was effected in this case, for it is difficult to conceive of more unequivocal acts, or more emphatic declarations evinc ing such an intention than those here employed.    But the contestant's counsel say, that under our statute, there can be no valid republication of a revoked will by parol, or by any acts of the testator, short of a re-execution of the will with all the formalities, with which it was originally executed.

And I am unable to find any reported adjudication upon

Matter of Simpson.

this question in this state, since the adoption of the Revised Statutes. Its importance will justify a somewhat extended examination of it.

And first, what is meant by the publication of a will? Evidently it is but one of the four acts, prescribed by section 38, of the Statute of Wills and is defined in the third subdivision of that section, as follows: "The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed to be his last will and testament. "

Bouvier, in his Law Dictionary, says that when spoken of a will: "It signifies that the testator has done some act, from which it can be concluded that he intended the instrument to operate as his will."

The supreme court, in *Lewis* agt. *Lewis* (13 *Barb.*, at *p.* 24), define publication to be the declaration by the testator, at the time of signing, or acknowledging his signature, that the instrument is his will; and the same court in *Butler* agt. *Benson* (1 *Barb.*, 529), held that four things are requisite to the due execution of a will and among them, "publication or declaring to them (*i. e.*, the witnesses), at the time of making or acknowledging subscription, that it is his last will and testament." In *Nipper* agt. *Groesbeck* (16 *Barb.*, 670), BACON, J., says that the third requisition of the statute requires "what is technically known as the publication of the will." To the same effect is *Torry* agt. *Brown* (15 *Barb.*, 3051), *Burrett* agt. *Silliman* (16 *id.*, 198), *Sequine* agt. *Sequine* (2 *id.*, 393), *Lewis* agt. *Lewis* (11 *N. Y.*, 220).

Our statute of wills is peculiar in this respect; the English statute, and that of many of the United States, not requiring, any publication, as a distinct act in the execution of a will (1 *Redf.*, *pp.* 213 – 217). The thirteenth section of the present English Statute (1 *Vict.*, *ch.* 26), expressly provides, that publication shall be unnecessary; and it has been doubted whether, as to a will of real estate, publication, in the sense required by the statute of this state, was ever necessary since

the enactment of 29th *Chas.* 2, *chap.* 3 (*See opinion of the chancellor, in Brinkerhoff* agt. *Remsen*, 8 *Paige*, 488). As most of the cases there, involving the question of the proper execution of testamentary instruments, have arisen in regard to wills of real estate, this fact will probably explain why the later English reports are so barren of authorities upon this subject.

It will thus be seen that publication itself is merely a parol declaration, on the part of the testator, making known, or declaring, in a public manner, the testamentary character of the instrument, which he has already signed in the presence of the witnesses.

Considering the nature of the original act of publication, there would seem to be no good reason for holding that a republication cannot be effected in the same manner. It is simply a second publication, or publication anew of the instrument.

Bouvier defines it to be " an act done by the testator, from which it can be concluded that he intended that an instrument which had been revoked by him, should operate as his will."

The English Statute of 1 *Vict.* (*chap.* 26, *sec.* 32) provides that no revoked will shall be revived, otherwise than by the " re-execution " thereof, and the thirty-fourth section, limiting the operation of the act to wills executed after January 1, 1838, provides that every will " re-executed, republished, or revived," shall, for the purpose of the act, be deemed to have been made at the time it was so re-executed, *republished*, or revived ; " and the author of *Hayes and Jarman on Wills*, in a foot note to this section, at page 58, says : " The word *republished* seems to have crept in by mistake. The section contemplates the re-execution of a will, after the act has come into operation ; such re-execution must be performed with the formalities required by section 9. If these be complied with *publication is unnecessary*, if not, it is of no avail." Clearly recognizing that republication and re-execution are not synonymous, or convertible terms. Much confusion upon the sub-

ject has arisen from the fact that in some of the United States, and other countries, there are statutes expressly providing the manner in which a republication shall be made, but our statute is entirely silent, as to the requirements necessary to constitute a valid republication. The term "republish," is no where used in the statute, except in the section referred to, nor is the word "publish," or "publication," or "republication," any where employed. The statute, therefore, gives us no light as to the sense in which this term is to be construed. The revisers and the legislature seem to have used the word, as if it had already a well understood and well defined legal signification. They seem to have regarded its construction, as well settled by a long course of judicial decision, and whatever that construction is found to be, must be deemed to be the meaning of the statute, except so far as it may have been modified by the statutory requirements, in regard to publication. An examination of the cases upon this subject has satisfied me that in England, prior to the act of parliament of 1 *Vict.*, c. 26, a parol republication of a revoked will of personal property, was sufficient to revive the will. It was different with respect to a devise of real estate, for the statute of frauds intervened, and declared that every devise of land should be void that was not in writing and signed by the testator and attested by at least three subscribing witnesses (29 *Car.*, 2 c. 3 ) ; but the rule in regard to wills of personal property, remained unchanged, until the passage of the wills act of 1 Vict. (1 *Redf.*, *pp.* 367, 368). By keeping in view this distinction between devises of real estate, and wills of personal property, much confusion will be avoided, and the authorities upon the subject found to be nearly harmonious.

The earliest reported English case I am able to find is that of *Hull* agt. *Dench* (1 *Vernon*, 330), decided in chancery, 1685. There was there an implied revocation growing out of the execution by the testator, after making his will, of a mortgage in fee of lands devised in the will, After the execution of the mortgage the testator declared in the presence of sev-

eral witnesses that his former will should stand, and the master of the rolls thought that was a new publication of the will, though it was objected that such parol declarations, since the statute of frauds and perjuries, would not amount to a new publication and it was also there held that republication of a will was favored in equity and slight evidence would be enough to establish it. The will was made in 1663, before the statute of frauds, and the testator died in 1683, after its enactment; and it does not appear when the new publication occurred.

Then came the case of *Alford* agt. *Earles*, in the same court, 1690, when the question arose as to the effect of a codicil to republish a will, and the case of *Cotton* agt. *Cotton* was cited, tried in the common pleas before lord chief justice NORTH, where the testator saying his will was in a box in his study, amounted to a new publication. And the editor in a foot note ( *1st Am. ed.* ) refers to *Anon.* ( 2 *Shaw*, 48), where it was held by all the court, that the words "my will in the hands of J. S. shall stand" amounted to a good republication, if attended by circumstances demonstrating *animus republicandi* in the testator; but doubts their effect in the case of a will of lands, since the statute of frauds, as there can be no republication of such a will by implication, but the will must be re-executed, otherwise a devise of lands will not be good, and cites PARKER, chief justice, in *Ackerly* agt. *Vernon (Com. Rep.*, 381 ) and *Martin* agt. *Savage* ( *Nov.* 22, 1740 [ *not reported* ] ). In *Lytton* agt. *Lady Faulkland* ( 2 *Eq. Ca. Ab.*,768 ), decided in 1708, the effect of the execution of a codicil disposing only of personalty, was considered and it was decreed not to be a republication of the will so as to pass after-acquired lands, because, since the statute of frauds, there could be no devise of lands by an implied republication, as the paper in which a devise of lands is contained ought to be re-executed in the presence of three witnesses. But in *Ackerly* agt. *Vernon*, reported in the same volume, it was held the other way and that there might be a republication without

re-execution and hence by implication, and the latter case seems to have been followed in all the subsequent cases as the better authority.

In *Ambler* agt. *Miller* (2 *Atkin, at page* 599 ) the question arose, in 1743, in regard to a bequest of personalty. There the testator was looking ámong his papers for another instrument with a. person who was assisting him in making the search, and the latter having taken up his will by mistake the testator said to him, " that is my will" and the lord chancellor ( HARDWICKE ) ·held· it was not a good republication for the reason that he made the remark "not meaning to republish but only to show that it was not the paper he wanted. To make it a republication there must be *animus republicandi,* in the testator."

In the case of *Barnes* agt. *Crowe* ( 1 *Vesey, Jr.,* 486 ), decided in 1792, the question received a ·very exhaustive review, both in the argument of counsel and the opinions of the court. It involved the point whether the execution of a codicil disposing of personal property alone, but attested by three witnesses, was there declared to be that " to republish a will re-execution is not necessary, nor a particular intent to republish; intent to consider it as of a subsequent date is sufficient, which intent, *in case of land,* must, since the statute of frauds, appear in writing according to the provisions of the statute."

There are many other English cases holding' substantially the same doctrine ( *The Attorney-General* agt. *Downing, Amb.,* 571; *Jackson* agt. *Harlock, id.,* 487; *Potter* agt. *Potter,* 1 *Ves., Sen.,* 437; *Gibson* agt. *Lord Montford,, id.,* 485; *Carlton* agt. *Griffin,* 1 *Burr.,* 549; *Lopping* agt. *Fernyhough,* 2 *Broc. C.,* 291 ); and such remained the settled law of England until the passage of 1 *Vict. c.* 26, the twenty-second section of which expressly provides that no will or codicil or any part thereof which shall be in any manner revoked, shall be revived otherwise than by the re-execution thereof. It also became the law of New York upon its organization as a state,

and not having been changed by statutory enactment, was the law at the time of the adoption of the Revised Statutes.

Neither the revisers or the legislature have assumed to change it, and they use the word "republished" as if it were one of familiar legal import, needing no definition or explanation to illustrate its meaning.

The only reported case in this state upon the question of parol republication is that of *Jackson* agt. *Potter* ( 9 *John.*, 312 ), which was decided in 1812, and was a case where subsequently to the making of the will the testator acquired other lands, which, as the law then was, would not pass by the will, and it was sought to prove a parol republication in order to pass the after-acquired lands ; and it was held that a parol republication was not sufficient for that purpose.

The court, in a very brief *per curiam* opinion, say : " It is equally well settled, that the republication of the will *so as to affect the after-acquired lands* must be made with like solemnity as the execution of the original will," which is not in conflict, but in harmony with the views here expressed. I have not overlooked the case of *Simmons* agt. *Simmons* ( 26 *Barb.*, 76 ), in which judge GOULD, after citing the fifty-first ( then the forty-sixth ) section of the statute says " Here, by legislative and simultaneous construction, a second will duly made and executed ( without any clause declaring the former one revoked ) is shown to have put the first so utterly out of vital existence that it either needs republication ( tantamount to an entirely new execution ) or an express revivor by the terms of the writing revoking the second will." Here the learned judge declares that under this section a republication is tantamount to an entirely new execution. It is not clear what was intended by this expression. If it means simply that the legal operation of a republication was to impart to the will the same force and effect as if it had been executed anew, then there is in it nothing opposed to the views here expressed ; but if it means that in order to constitute a valid republication there must be an entirely new execution of the

will. This might be true so far as the instrument was a will of real estate, but as to wills of personalty it is at the best but a mere *dictum*, as there was no question involved in the case calling for a construction of that section in this respect: And the reporter in a foot note calls attention to the fact that the corresponding section of the English statute speaks of a *devise* and not necessarily of a *will*.

The Pennsylvania reports abound in cases involving the question of parol republication, and while their statute of wills differs from ours in many essential respects, yet they follow the English rule, and hold that parol republication is good, unless prohibited by express statutory enactment, and thus they are authority for the position taken here ( *Howard* agt. *Davis*, 2 *Bina.*, 4191; *Jones* agt. *Hartley*, 2 *Whart.*, 103; *Campbell* agt. *Jamison*, 8 *Penn. St.*, 498; *Musser* agt. *Curry*, 3 *Wash. C. C.*, 481; *Flinthame* agt. *Bradford*, 10 *Penn. St.*, 82; *Jack* agt. *Shoenberger*, 10 *Harris*, 416; *In Fransen's Will*, 26 *Penn. St.*, 207; *Gable's Exr.* agt. *Daub*, 40 *Penn. St.*, 217).

*Jack* agt. *Shoenberger* (*supra*) was twice before the supreme court of that state. It was ejectment for after-acquired lands; the plaintiff claiming as heir, and the defendant under an alleged parol republication of a will. Upon the first trial in the common pleas, evidence of the parol republication was admitted, and the defendant had a verdict. Upon error to the supreme court, a new trial was ordered on the ground that evidence of a parol republication was inadmissible; chief justice GIBSON, writing the opinion, and of the other judges, two concurring, and two dissenting. The second trial resulted in a verdict for the plaintiff, evidence of the parol republication having been excluded; and upon error again to the supreme court, a new trial was again granted, and the former decision of that court overruled, and the evidence held to be competent, and admissible, WOODWARD, J., delivering the opinion and all the other judges concurring.

In *Gables' Exr.* agt. *Daub* (*supra*), the same court, READ,

Matter of Simpson.

J., says: "So, prior to the statute of frauds, a *will* of *lands* might have been republished by parol, and would have all the effect of an original will from the time of its republication, and would pass lands purchased by the testator, between the first execution, and the republication; and such, also, was the law of this state." Much stress is laid by the contestant's counsel upon the reviser's notes to section 51, as manifesting an intention on their part to exclude evidence of a parol republication.

I do not so understand their language. The say, in substance, that the question is in doubt as to the effect of the revocation of a subsequent will in setting up a prior one; that in the common law courts, the presumption is in favor of a revival; while in the ecclesiastical courts it is the other way or else no presumption is indulged in at all, and that in both courts it is undisputed that parol evidence is admissible to ascertain the real intentions of the testator and to determine the fact of a revival of his will, or a designed intestacy. They then declare " it is this rule which the revisers propose to change, by adopting a presumption against a revival, and excluding evidence to contradict it;" but there is nowhere an intimation, even, that they propose to change the rule in regard to a parol republication, or to provide that republication could not be effected by any thing less than a re-execution of the will.

They did change the rule as to a publication, by explicitly defining the form of words necessary to constitute that act, and perhaps to that extent, modified the rule in regard to a republication.

Hitherto no particular acts or words were required to amount to a publication. It was enough, if it appeared from the facts and circumstances attending its execution, that the testator intended that the instrument should operate as his will. So in one case where the will was in his handwriting, but nothing was said by him at the time it was signed and attested indicating its testamentary character, it was held to be a sufficient publication (*Peate* agt. *Ongley*, *Comyns Rep.*, 197).

And in another case it affirmatively appeared that the testator deceived the subscribing witnesses, by informing them that it was a deed and not a will, yet it appearing from other evidence, that the testator knew the nature of the instrument, and intended it as his will it was determined to be a good publication (*Trimmer* agt. *Trimmer*, *in* 4 *Burns' Eccl. Law,* 130).

The Revised Statutes, in order to remove all doubt and uncertainty upon the subject, require, as one of the distinct acts in the execution of a will, that the testator shall declare, in the presence of two witnesses, that the instrument is his last will and testament, and in that respect have infringed upon the old rule in regard to publication, and to that extent they have, perhaps, changed the requirements necessary to a republication, but no further.

The result of this review of the question may be briefly stated as follows :

Prior to the statute of frauds (29 *Car.*, 2) all wills might be republished by parol ; subsequently to that enactment, wills of real estate could be republished only by a re-execution thereof, but wills of personalty, could still be republished by parol until the passage of the act of 1 *Victoria*, and no particular form of words was necessary, either to a valid publication or republication ; any thing which indicated a present intention that the instrument should take effect as his will sufficed ; such was the law of this state at the time of the adoption of the Revised Statutes, which have changed it only so far as to require a parol declaration, on the part of the testator, in the presence of two witnesses, that the instrument is his last will and testament.

In this case the rule was fully complied with. It is conceded that the testator, immediately after the destruction of the codicil, deliberately and with the express intention of republishing the will of 1871, declared, in the presence of two witnesses in the most solemn and emphatic manner, that the instrument was his last will and testament. No objec-

Matter of Simpson.

tion is made to the competency of the witnesses. They were in fact called by the contestant and the evidence upon this subject drawn out upon her examination.

I am the more readily constrained to this conclusion, because the intention of the testator that the will of 1871 should be revived according to its original terms and provisions is so clear and unmistakable.

The courts of this state have repeatedly held that the principal object of our statute of wills was, not to obstruct the citizen in the exercise of his right to dispose of his property by will, but to secure him in the enjoyment of that right and hence, in furtherance of this object, they have frequently sacrificed the strict letter of the law for its more beneficent spirit ( *Hoysradt* agt. *Kingman*, 22 *N. Y.*, 372 ; *Coffin* agt. *Coffin*, 23 *N. Y.*, 9 ; *Gamble* agt. *Gamble*, 39 *Barb.*, 373 ).

The true rule of construction of the statute is well stated by DENIO, J., in *Hoysradt* agt. *Kingman* ( *supra, at p.* 379 ). " The general right to dispose of one's property by act in writing, to take effect at his death, is established by our statute respecting wills and has always been the law of this state. The restrictions, which from motives of prudence are thrown around that right, should be construed liberally in favor of the testament, *and forms should not be required which the legislature has not plainly prescribed.*"

It follows, if these views are sound, that whatever may have been the effect of the execution and subsequent destruction of the codicil of 1872 that the will of William Simpson, dated August 18, 1871, having been republished after the destruction of the codicil was his last will and testament, and as such was properly admitted to probate by my predecessor, and such probate should be confirmed.

Costs should not be allowed to either party as against the other or out of the estate.